# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| **JOE NATHAN GOODWIN** and **NATASHA DAKON**, *Plaintiffs*, v. **CRAWFORD COUNTY, GEORGIA; SHERIFF LEWIS S. WALKER; JAMES HOLLIS**, Individually and in his capacity as Deputy Sheriff of Crawford County; **WESLEY ANDREW NEESMITH**, Individually and in his capacity as Deputy Sheriff of Crawford County; and **AMY SIMS**, Individually and in her capacity as employee and agent of Crawford County, *Defendants*. | **CIVIL ACTION NO. 5:18-cv-00030-TES** |

## ORDER GRANTING DEFENDANT SIMS' MOTION TO DISMISS

According to Plaintiffs, Defendant Neesmith shot and killed their dog. Then, after consulting with Defendant Sims and Defendant Hollis, Defendant Neesmith forced Plaintiff Goodwin to cut off his dog's head so that it could be tested for rabies. Plaintiffs brought this action asserting claims under § 1983 along with various state law claims. Defendant Sims, who was not present when the dog was shot and decapitated, filed the instant Motion to Dismiss [Doc. 28]. For the reasons explained below, the Court **GRANTS** Defendant Sims' Motion to Dismiss [Doc. 28] and **DISMISSES** Plaintiffs' claims against

her **without prejudice**.

## FACTUAL BACKGROUND

On December 1, 2017, Defendant Neesmith was dispatched to Plaintiffs' home in response to a complaint involving their dog. *See* [Doc. 1, at ¶ 10]. When he got there, he pulled into Plaintiffs' driveway and unceremoniously shot the offending animal. *See* [*id.*] Not long after the dog met its untimely demise, Defendant Hollis showed up and deliberated with Defendant Neesmith about what to do next. *See* [*id.* at ¶ 11]. Ultimately, the two decided to called Defendant Sims at the Crawford County Health Department. *See* [*id.*] They informed her that the dog bit someone and asked "what steps should be taken." [*Id.*] Defendant Sims told the two officers and Plaintiff Goodwin (who apparently arrived at some point between the time Defendant Neesmith shot the dog and the time they called Defendant Simms) "that the dog's head would have to be removed." [*Id.*] She "further advised Plaintiff Goodwin that he . . . could be liable for the cost of a rabies shot if the dog's head was not removed and that the cost of the shot was approximately $20,000.00." [Doc. 21, at ¶ 11].

At this point, Defendant Hollis, "without basis or cause," ordered Plaintiff Goodwin to cut his late pet's head off so that it could be tested for rabies. [*Id.*] Not surprisingly, he refused and demanded that Defendants Neesmith and Hollis leave his property. *See* [*id.*] Defendant Hollis did not think much of Plaintiff Goodwin's position on the matter and expressed his displeasure by "attacking Plaintiff Goodwin[,] . . . forcing

2

him against his vehicle[,]" and threatening him with criminal charges—at least according to Plaintiffs. [*Id.*] Faced with the threat of arrest, Plaintiff Goodwin relented, and, in the presence of Defendants Neesmith and Hollis and Plaintiff Goodwin's wife and kids, complied with the deputy's order and cut off his dog's head with a knife. *See* [*Id.* at ¶¶ 12–14]. After the deed was done, Defendants Neesmith and Hollis told Plaintiff Goodwin that he would have to transport the dog's head to the Crawford County Health Department for testing. *See* [*id.* at ¶ 15]. Plaintiff Goodwin—quite understandably—was too emotionally distraught to comply, so Plaintiff Dakon took the head in for testing. *See* [Doc. 21, at ¶ 15].

Now, Plaintiffs assert claims against Defendants based on 42 U.S.C. § 1983 and under state law for intentional infliction of emotional distress, assault and battery, false arrest, false imprisonment, negligent hiring, and cruelty to animals. *See* [*id.* at ¶¶ 18–32].

## **STANDARD OF REVIEW**

A motion to dismiss tests the sufficiency of the allegations in a plaintiff's complaint. *Acosta v. Campbell*, 309 F. App'x 315, 317 (11th Cir. 2009). A complaint survives a motion to dismiss if it pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action" or "conclusory statements." *Iqbal*, 556 U.S. at 678. Thus, to decide whether a complaint survives a motion to dismiss, district courts use a two-step framework. *See McCullough v.*

*Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## DISCUSSION

### I. § 1983 Claim

The Court begins with the heavy-lifting: Plaintiffs' § 1983 claim against Defendant Sims. Plaintiffs argue that Defendant Sims' violated their substantive due process rights by coercing Plaintiff Goodwin to decapitate his dog. *See* [Doc. 31, at p. 4]. In their view, Defendant Sims engaged in unconstitutional coercion by simply telling Plaintiff Goodwin "that he had two choices: (1) decapitate his dog, or (2) face potential liability estimated at $20,000.00, as a result of his refusal to do so." *See* [*id.*] This, in Plaintiffs' words "represents a textbook example of coercion" and that such coercion is unconstitutional. *See* [*id.*][1]

---

[1] On a side note, Plaintiffs apparently believe that any time the Government uses financial pressure to direct an individual's conduct, it has engaged in unconstitutional coercion. There are a lot of problems with such a claim, not the least of which is the implication that the Government's use of financial pressure violates a person's substantive due process rights. To be sure, the doctrine of substantive due process is about as malleable as a fistful of microwaved Play-Doh, but to suggest it somehow limits the power of the government to use economic pressure to achieve its ends is legally baseless. However, as shown below, the Court does not find that Defendant Sims actually coerced Plaintiffs to do anything. She simply informed them of the options as she understood them.

4

So how do Plaintiffs arrive at the position that the government's use of economic coercion is unconstitutional? They rely principally on *Bradberry v. Pinellas County*, where the Eleventh Circuit noted that "[t]he fourteenth amendment was designed to protect people from arbitrary coercion by state governments."[2] 789 F.2d 1513, 1518 (11th Cir. 1986). But the real meat of *Bradberry* is not its reference to coercion—which, in the context of substantive due process, simply means an exercise of the government's power—but rather with its reference to *arbitrary* coercion. *See T.W. ex rel Wilson v. School Bd. of Seminole Cty.*, 610 F.3d 588, 598 (11th Cir. 2010) ("The Due Process Clause protects individuals against arbitrary exercises of government power."). In other words, the government can (and does) coerce its citizens, but only when it has a reason for doing so. How persuasive and closely tied the reason must be to the government's coercive action gets into the Fourteenth Amendment's tiered scrutiny analysis. But it is not necessary for the Court to analyze the government action through the lens of tiered scrutiny because it is clear that Defendant Sims' alleged coercion—assuming it was actually coercion—was not arbitrary.

Defendant Sims had a good reason to act as she did based on the circumstances confronting her. Consequently, the Court finds that her conduct was not "arbitrary" and therefore did not violate Plaintiffs' substantive due process rights. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998) ("[O]nly the most egregious executive action can be said

---

[2] Notably, Plaintiffs cite no cases in which a court found that economic coercion violated an individual's substantive due process rights.

to be 'arbitrary' in the constitutional sense.").

Another problem with this claim is that there are no allegations that Defendant Sims actually coerced Plaintiff Goodwin to do anything. Plaintiffs cite *Black's Law Dictionary* which defines coercion as "[c]ompulsion of a free agent by physical, moral, or economic force." *See* [Doc. 31, at p. 4] (citing *Coercion*, *Black's Law Dictionary* (10th ed. 2014)). Plaintiffs lose because they do not allege that Defendant Sims attempted to compel Plaintiff Goodwin to choose between the admitted indignity of cutting off his pet's head or risking potential monetary liability for the required rabies treatment. Further, Plaintiffs never alleged that Defendant Sims told Goodwin that he had to be the one to decapitate the dog. By Plaintiffs' allegations, she simply informed him of his options. Because Plaintiffs do not allege that Defendant Sims did or said anything in an effort to actually force Plaintiff Goodwin to decapitate his dog, their allegations fail to show that Defendant Sims' conduct rose to the level of coercion or that she violated the Constitution in any way.

## II. <u>Intentional Infliction of Emotional Distress Claim</u>

Now for the not-so-heavy lifting: Plaintiffs' IIED claim against Defendant Sims. This claim also fails. Under Georgia law, a plaintiff asserting a claim for intentional infliction of emotional distress "must demonstrate that: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Frank v.*

*Fleet Fin. Inc. of Ga.*, 518 S.E.2d 717, 720 (1999). "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim 'Outrageous!'" *United Parcel Serv. v. Moore*, 519 S.E.2d 15, 16 (Ga. Ct. App. 1999).

> Here, Plaintiffs allege that Defendant Sims
> 
> informed Plaintiff Goodwin, either directly through the speaker phone or through Defendant Hollis, that the dog's head would have to be removed. Sims further advised Plaintiff Goodwin that he, Goodwin, could be liable for the cost of a rabies shot if the dog's head was not removed and that the cost of the shot was approximately $20,000.00.

That's it. Those are the only allegations regarding the role Defendant Sims played in this whole debacle. Plaintiffs do not allege that Defendant Sims had some part in forcing Plaintiff Goodwin to decapitate the dog—such as urging him to do it over the phone—or that she said he had to be the one to do it. In fact, Plaintiffs' allegations are to the contrary because, rather than alleging that Defendants Neesmith and Hollis were motivated by something that Defendant Sims told them, they alleged that Defendant Hollis "without basis or cause" informed Plaintiff Goodwin that he would have to decapitate the dog.

Plaintiffs argue that Defendant Sims' alleged use of "financial pressure" was itself extreme and outrageous. But the Court disagrees. Plaintiffs do not allege that the information Defendant Sims conveyed about the financial consequences of not removing the head were untrue. Consequently, to the extent it can be said that Defendant Sims

7

applied financial pressure, such pressure was not misplaced or inappropriate. Instead, Plaintiffs allegations merely show that Defendant Sims accurately communicated the gravity of the situation and informed Plaintiffs of their options. In other words, she did her job, and that is hardly outrageous.

Finally, Plaintiffs argue that "[a] reasonable inference from these factual allegations is that [Defendant] Sims did not simply inform [Plaintiff] Goodwin of the standard operating procedures when confronted with the possibilit[y] of rabies; rather, [Defendant] Sims['] statements were designed to press-gang [Plaintiff] Goodwin into decapitating his own dog." [Doc. 31, at p. 9]. Again, the Court disagrees. There is not even a whiff of a suggestion in the Complaint that Defendant Sims was trying to "press-gang" Plaintiff Goodwin into decapitating his dog. Plaintiffs make no allegations whatsoever that Defendant Sims—for some perverse reason—wanted Plaintiff Goodwin to decapitate the dog. Instead, Plaintiffs allege that, consistent with the Georgia Rabies Control Manual, Defendant Sims told the parties that the head would have to be removed to test the animal for rabies. Nothing more, nothing less. Plaintiffs do not allege that she said Plaintiff Goodwin would have to do it or that it would have to be done on Plaintiffs' driveway. In the absence of such allegations, Plaintiffs' claim for IIED against Defendant Sims fails. Because the Court concludes that Plaintiffs failed to allege sufficient facts to support a claim of IIED against Defendant Simms, it need not wade into the murky waters of Georgia's law of sovereign and qualified immunity.

## CONCLUSION

The bottom line is this: Plaintiffs' Complaint simply fails to allege that Defendant Sims' conduct was coercive. Thus, to the extent their claims are dependent on Defendant Sims having coerced Plaintiff Goodwin, their claims must fail. Accordingly, the Court **GRANTS** her Motion to Dismiss [Doc. 28] and therefore **DISMISSES** Plaintiffs' claims against her **without prejudice**.

**SO ORDERED** this 21st day of June, 2019.

s/ Tilman E. Self, III
**TILMAN E. SELF, III, Judge**
**UNITED STATES DISTRICT COURT**
