## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **JOE NATHAN GOODWIN and NATASHA DAKON,** | |
| *Plaintiffs,* | **CIVIL ACTION NO.** |
| **v.** | **5:18-cv-00030-TES** |
| **CRAWFORD COUNTY, GEORGIA**, *et al.,* | |
| *Defendants.* | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Before the Court are summary judgment motions for Defendants Lewis Walker [Doc. 48], Crawford County [Doc. 49], James Hollis [Doc. 50], and Andrew Neesmith [Doc. 51] (collectively "Defendants"). Defendants argue that all the claims against them from events that led to an individual dismembering his own dog ought to be dismissed. Plaintiffs Natasha Dakon and Joe Goodwin (collectively "Plaintiffs") filed suit for damages as a result of the unfortunate event. For the reasons that follow, the Court allows Goodwin's §1983 claims for Fourth Amendment violations against Neesmith and Hollis to proceed. The Court grants summary judgment to the Defendants for all of the Plaintiffs' other claims against the Defendants.

## BACKGROUND

This action stems from a potentially rabid dog biting a person on December 1,

2017. [Doc. 66, Neesmith Depo., pp. 11:19—12:10]. Deputy Neesmith and Investigator Hollis, members of the Crawford County Sheriff's Office, responded to the scene. Sheriff Walker never appeared on the scene with regard to the relevant events described below. [Doc. 55, Walker Depo., p. 16:7—8].

When Neesmith arrived at Plaintiffs' home, he shot and killed the Plaintiffs' dog, "Big Boy", after the dog charged at him. [Doc. 48-9, 0:31:24—0:31:59]; [Doc. 59-7, Dakon Depo., p. 15:2—6]; [Doc. 56, Neesmith Depo., pp. 15:22–16:13]. Afterwards, Neesmith spoke with Dakon, who then called her husband, Goodwin, to tell him that Neesmith had shot and killed Big Boy. [*Id.* at p. 16:17—18]; [Doc. 59-7, Dakon Depo., p. 15:14—19]; [Doc. 59, Goodwin Depo., pp. 48:8—49:23]. When Goodwin arrived home, he volunteered to wait for Neesmith's superior to arrive. [*Id.,* pp. 54:15—55:3].

Hollis ultimately arrived on the scene, and Neesmith briefed Hollis on what had occurred. [Doc. 57, Hollis Depo., pp. 20:8—21:1, 21:23—22:4]; [Doc. 56, Neesmith Depo., p. 17:11—13]. Hollis then showed Neesmith the Crawford County Health Department protocol document regarding people bitten by an animal provided to him by the Crawford County Sheriff's Office, and Hollis began asking Goodwin a series of questions off of that protocol sheet, including the dog's owner, name, and vaccination records. [Doc. 57, Hollis Depo., pp. 22:7—12, 25:6—26:16]; [Doc. 56, Neesmith Depo., p. 21:10—14].

Goodwin claims that he did not know where the vaccination records were and

that he would have to get Dakon to find them, as she kept track of the records and might have a better idea of where they could be found. [Doc. 59, Goodwin Depo, pp. 68:20—69:5].[1]

While Goodwin assured the officers that he would provide the officers with Big Boy's vaccination records, he could not produce them at the scene. [Doc. 59, Goodwin Depo, p. 69:2—8]. Goodwin contacted Dakon, who also could not recall the location of the vaccination records. [Doc. 59-7, Dakon Depo., p. 26:2—8 (Goodwin "called me and told me that they were wanting him to cut Big Boy's head off or go to jail, because he needed the vaccination papers . . . And I said, I do not know where they are at, that I recall.")]. If vaccination records cannot be found and the animal displayed signs of rabies, the animal's head needs to be removed for a rabies examination pursuant to the Crawford County Health Department. [Doc. 48-13, pp. 1—2]; [Doc. 48-14, p. 1].

Hollis then contacted Amy Sims ("Sims") with the Health Department. [Doc. 57, Hollis Depo., 22:13—17]. Hollis placed the call with Sims on speaker so that Goodwin

---

[1] In Goodwin's affidavit, Goodwin also claims that Hollis told Goodwin he could not go inside to look for the records. The Court entered an Amended Order [Doc. 73] granting Plaintiffs' Motion to Amend Plaintiffs' Response to Correct Filing Error [Doc. 69] to correct the affidavits because they lacked the proper notary requirements. [Doc. 73, p. 1]. Defendants objected to the Plaintiffs' amended affidavits arguing, in part, that they still lacked the proper notary requirements. [Doc. 74, pp. 1—2]. Defendants correctly point to the lack of a jurat stamp on Plaintiffs' second version of the affidavits. *See Williams v. Smith*, No. 1:12-CV-00176, 2014 WL 840014, at *2 n.3 (M.D. Ga. Mar. 4, 2014) ("Defendant Loyed's affidavit bears the signature of a notary, but not the seal of a notary, as required by O.C.G.A § 45-17-6(a)(1)…Accordingly, Defendant Loyed's affidavit is not a sworn affidavit or declaration which can be considered in the determination of the pending Motions for Summary Judgment"). Because the affidavits lack the requisite notary seal/stamp, the Court **SUSTAINS** Defendants' objection to the second versions of Plaintiffs' affidavits, and the Court will not consider the affidavits.

could hear the call between him and Sims. Goodwin heard Sims say that he (Goodwin) could cut off his dog's head or take the dog to a vet and have them remove the head.[2] [Doc. 56, Neesmith Depo., pp. 18:18–19:1].

Faced with the prospect of decapitating his pet, Goodwin became understandably upset. According to video footage, Goodwin can be seen pacing in his yard and lighting a cigarette while Hollis spoke to someone on the phone. [Doc. 48-9, 1:05:20—1:06:10]. Goodwin can also be seen shaking his head and—while saying something to the officers—gesturing to the officers to get off his property. [*Id.*].

Then, Goodwin began recording on his personal phone and told the officers, "Alright, I heard what she said. I will cut the head off and get it to y'all. You and you [pointing to Hollis and Neesmith], leave. Bye." [Doc. 53-1, 0:00:00—0:00:14]; [Doc. 48-9, 1:06:35—1:06:52].

After Goodwin instructed the officers to leave his premises (seemingly not for the first time), Hollis—ending the phone call with Sims and approaching Goodwin— stated, "I'm Investigator Hollis, you not going to talk to me nor my deputy like that." [Doc. 53-1, 0:00:14—0:00:25]

Goodwin then turned to walk away, but Hollis grabbed Goodwin and slammed

---

[2] The record does not contain any explanation of exactly why the County policy would allow apparently anyone other than a trained professional to cut off the head of a potentially rabid animal. The video that shows Goodwin cutting off his dog's head does not appear to show that he used any sort of protective equipment such as rubber gloves, mask, etc.

him onto the hood of his own truck. [Doc. 48-9, 1:06:52—1:07:52]. Goodwin claims this incident left welts on his back. [Doc. 59, Goodwin Depo. p. 102:19-24]. Goodwin did not seek medical attention for this injury. [*Id.*, pp. 102:22—103:5].

Hollis—having pinned Goodwin against his truck—then said, "you're not going to talk to anyone like that, okay? . . . You're either going to listen and be inclined... we are trying to protect you from being sued in your home." [Doc. 53-1, 0:00:25—0:01:00]. Hollis—still restraining Goodwin—told Goodwin his options were to either "cut the dog's head off at the base of the neck" or to take the dog to a veterinarian for the procedure. [*Id.*] After Goodwin said he would probably be able to get the dog to the vet on Monday, Hollis said it had to be done that day so that Goodwin wouldn't get sued. [*Id.*].

Goodwin then accused Hollis of assaulting him. [*Id.*, 0:01:00—0:02:00]. Hollis responded by accusing Goodwin of being "irate." [*Id.*]. When Goodwin told Hollis that he could "cut the motherfucker off," Hollis—taking offense to being addressed with profanity--told Goodwin the "mfs" need to stop. [*Id.*]. Hollis then threatened to "take [Goodwin] to jail and charge [him]." [*Id.*]. However, when Goodwin asked what he could be charged with, Hollis did not identify any charges and instead told Goodwin he'd find out when he was taken to jail. [*Id.*].

Hollis then left Goodwin and Neesmith to consult with officials on his phone about how to handle the situation, including whether Goodwin could be charged for

refusing to remove his dog's head. [*Id.*, 0:02:00—0:02:30]; [Doc. 50-14, p. 16].

Neesmith assisted Hollis with restraining Goodwin while he was held against his truck. [Doc. 48-9, 1:06:59—1:07:52]. When Goodwin pressed Hollis on what he could be charged with, Neesmith can be heard in the background telling Goodwin he could be charged with disorderly conduct, reinforcing Hollis's claim Goodwin could be arrested. [Doc. 53-1, 0:01:50—0:01:53]. Neesmith then stood with Goodwin while Hollis was consulting with other officials. [Doc. 48-9, 1:07:52—1:16:20]. Goodwin claimed that he was told by the officers he could not leave the scene during this time. [Doc. 59, Goodwin Depo., p. 106:19-24]. Neesmith remained with Goodwin while Goodwin later cut off the head of his dog. [Doc. 48-9, 1:07:52—1:16:20]. Hollis does not appear to return to Goodwin and Neesmith until Goodwin is already in the process of removing his dog's head. [*Id.*].

As mentioned above, Goodwin ultimately cut his dog's head off with a pocket knife and a knife from his house and placed the dog's head in a bag after doing so. [Doc. 57, Hollis Depo., pp. 27:23—28:4]; [Doc. 56, Neesmith Depo., p. 19:17—20]; [Doc. 48-9, 1:16:20—1:38:00]. This process, undertaken without gloves and with an ordinary kitchen knife (that the court assumes was not sterilized), failed to follow the protocols outlined by the Health Department. [Doc. 59-7, Dakon Depo., p. 32:15-22]; *see also* [Doc. 59, Goodwin Depo., pp. 114:6—115:18].

Mr. Goodwin was never placed in handcuffs or in the back of a patrol car at any

time during the events of December 1, 2017. [Doc. 59, Goodwin Depo., p. 73:18—24]; [Doc. 56, Neesmith Depo., p. 24:23-25]. While Goodwin was not placed into the back of a patrol car, he was held against the hood of his truck after Hollis slammed him into it. *See* [Doc. 48-9, 1:06:52—1:07:52].

Based on these events, Plaintiffs asserted claims against Defendants Crawford County, Sheriff Walker, Deputy Neesmith, Investigator Hollis, and Sims based on 42 U.S.C. § 1983 and under state law for intentional infliction of emotional distress, assault and battery, false arrest, false imprisonment, negligent hiring and retention, failure to properly train and supervise, and cruelty to animals. *See* [Doc. 21, ¶¶ 18–32].

Plaintiffs' claims against Sims were dismissed on June 21, 2019. [Doc. 34]. The remaining defendants now move to have the Court dismiss the allegations against them.

## DISCUSSION

### A.  Claims Asserted by Plaintiff Natasha Dakon

As a preliminary matter, all Defendants have moved to dismiss Dakon's claims against them. [Doc. 48]; [Doc. 49]; [Doc. 50]; [Doc. 51]. As noted in Defendant Hollis's summary judgment motion, the record lacks any evidence that any Defendant violated Dakon's constitutional rights. [Doc. 50-1, p. 19 n.4].[3] The Court agrees. Thus, the Court

---

[3] In fact, Dakon never makes any arguments at all in any brief. Plaintiffs' briefs focus solely on the claims asserted by Goodwin.

**DISMISSES** Dakon's federal claims. The Court also **DISMISSES** any state law claims

Dakon may have made for the reasons explained below.

### B.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a

reasonable jury to return a verdict for the nonmovant and a fact is material if it "might

affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

considering this motion, "the evidence of the [nonmovant] is to be believed, and all

justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However,

the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v.*

*United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011). Further, when a video

recording exists of the pertinent events—as in this case—the Court "views the facts in

the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

The movant "bears the initial burden of informing the district court of the basis

for its motion[] and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS*

*Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to rebut that showing by

producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

C.    **Analysis**

1.    **Claims Against Sheriff Lewis Walker**

First, the Court examines the federal claims addressed in Walker's motion for summary judgment. *See* [Doc. 48]. In his motion, Walker argues that the claims against him under 42 U.S.C. § 1983 and state law should be dismissed. [Doc. 48-1]. Plaintiffs concede that they are unable to oppose Walker's motion. [Doc. 63-4, p. 3].

Plaintiffs agree that "Walker is entitled to summary judgment with respect to Plaintiffs' § 1983 federal claims." [Doc. 63-4, p. 2 citing *Brooks v. Wilkinson Cty.*, 393 F. Supp. 1147, 1173 (M.D. Ga. 2019)]; [Doc. 48-1]. Additionally, Plaintiffs concede they are "unable to overcome Walker's official immunity under Georgia law." [Doc. 63-4, p. 2 citing *Christmas v. Harris Cty.*, NO: 4:19-cv-00053, 2019 WL 3767471, at *6 (M.D. Ga. 2019)]. After reviewing the record, the Court also concludes that Walker is entitled to summary judgment because he is entitled to Eleventh Amendment immunity as to Plaintiffs' federal claims and official immunity as to their state law claims. Accordingly, the Court **GRANTS** Walker's motion for summary judgment.

2.    **Claims Against Crawford County**

The Court next examines the federal claims addressed in Crawford County's

motion for summary judgment. *See* [Doc. 49]. Crawford County's motion argues that (1) Crawford County cannot be liable for the acts of the Sheriff's deputies, (2) Plaintiffs have not identified any Crawford County policy that caused a constitutional violation, and (3) sovereign immunity bars all state law claims against Crawford County. [Doc. 49-1, pp. 3, 6, 7].

As with Walker's motion, Plaintiffs do not oppose Crawford County's motion. [Doc. 63-3, p. 2] Plaintiffs admit that they failed to identify a Crawford County policy that caused the alleged constitutional violation. [*Id.*]; *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Further, Plaintiffs agree with Crawford County that, as a matter of law, counties have extensive immunities granted under Georgia's Constitution and laws that bar Plaintiffs recovery against Crawford County. [*Id.*, pp. 1—2 citing *Manders v. Lee*, 338 F.3d 1304, 1312 (11th Cir. 2003) and O.C.G.A. § 36-1-4].

The Georgia Constitution, as amended in 1991, provides, "[t]he sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e) (Supp. 1993). The Supreme Court of Georgia has held that sovereign immunity extends to counties under the 1991 constitutional amendment. *Gilbert v. Richardson*, 452 S.E.2d 476, 479 (Ga. 1994); *See also* O.C.G.A. § 36-1-4 ("[a] county is not liable to suit for any cause of action unless made so by statute"). As the Plaintiffs point to no authority

showing Crawford County waived its sovereign immunity, the Plaintiffs' state law claims against Crawford County are barred.

Accordingly, the Court agrees that there is nothing in the record to support Plaintiffs' claims against Crawford County under federal or state law. Therefore, the Court **GRANTS** Crawford County's motion for summary judgment.

### 3. §1983 Claims Against Investigator James Hollis and Deputy Andrew Neesmith

The Court now considers the federal claims addressed in Neesmith and Hollis's motions for summary judgment. [Doc. 50]; [Doc. 51]. In their reply, Plaintiffs concede that Hollis and Neesmith are "entitled to summary judgment as to any § 1983 claim alleging violation of the Fifth and Eighth Amendments." [Doc. 63-1, p. 4]; [Doc. 63-2, p. 4]. After a review of the relevant facts and law, the court agrees and **DISMISSES** any §1983 claims against Hollis and Neesmith relating to the Fifth or Eighth Amendments.

Thus, the Court will focus its remaining analysis on Goodwin's § 1983 claims alleging Fourth Amendment and Fourteenth Amendment Due Process Clause violations. *See* [*Id.* citing *Pittman v. State Farm Fire & Case. Co.*, 662 F. App'x 873, 882 (11th Cir. 2016) and *Weiland v. Palm Beach Cty. Sheriff Office,* 792 F.3d 1313 (11th Cir. 2015)].

### i. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . .

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To obtain dismissal based on qualified immunity, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). If he was, the burden shifts to the plaintiff to overcome the official's qualified immunity. *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017).

To determine whether an official was engaged in a discretionary function, the Court considers whether the acts the officials undertook "are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263, 1265 (11th Cir. 2004). Here, Hollis and Neesmith responded to the scene of a potentially rabid dog biting a victim. These acts easily fall within the peace officers' duties. Therefore, Hollis and Neesmith were performing discretionary functions during the matter at issue.

To overcome the qualified-immunity defense, Goodwin must now prove that "the defendant violated [his] constitutional rights" and "that, at the time of the violation, those rights were 'clearly established . . . in light of the specific context of the case, not as a broad general proposition.'" *Jackson v. McCurry*, 762 F. App'x 919, 925 (quoting *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). The Court may address these issues in any order, *Pearson*, 555 U.S. at 236, "but, to survive a qualified-

immunity defense, [the plaintiff] must satisfy both showings." *McCurry*, 762 F. App'x at 925 (quoting *Wardynski*, 871 F.3d at 1208).

A plaintiff may "demonstrate that the contours of the right were clearly established in one of three ways." *McCurry*, 762 F. App'x at 925 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). First, a plaintiff may establish that "a materially similar case has already been decided." *McCurry*, 762 F. App'x at 925 (quoting *Loftus,* 690 F.3d at 1204). Second, the plaintiff may "point to a broader, clearly established principle that should control the novel facts of the situation." *McCurry*, 762 F. App'x at 925 (quoting *Loftus,* 690 F.3d at 1204). Third, "the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary." *McCurry*, 762 F. App'x at 925 (quoting *Loftus,* 690 F.3d at 1205). The precedents that clearly establish law for these purposes are those of the Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court. *See McCurry*, 762 F. App'x at 925-26.; *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012); *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

### ii. Substantive Due Process Claims Against Hollis and Neesmith

Goodwin argues that Neesmith and Hollis's conduct violated his substantive due process rights found in the Fourteenth Amendment by arbitrarily coercing Goodwin into decapitating his dog. *See* [Doc. 63-2, pp. 5—7]. In Goodwin's view, the officers engaged in unconstitutional coercion when they ordered Goodwin to decapitate Big

Boy or go to jail. *See* [*Id.*, p. 7].

Goodwin relies on Eleventh Circuit case law that holds "[t]he fourteenth amendment was designed to protect people from arbitrary coercion by state governments." *Bradberry v. Pinellas County*, 789 F.2d 1513, 1518 (11th Cir. 1986). To be "arbitrary in the constitutional sense, an . . . abuse of power must 'shock[ ] the conscience.'" *T.W. ex rel. Wilson v. Sch. Bd. of Seminole County*, 610 F.3d 588, 598 (11th Cir. 2010); *see Cty. of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998) ("[O]nly the most egregious executive action can be said to be 'arbitrary' in the constitutional sense.").

The seminal case on substantive due process violations is *Rochin v. California*, 342 U.S. 165, 172 (1952) where the Supreme Court found a conscience-shocking violation of substantive due process where police directed an emergency room doctor to extract a suspect's stomach contents, which included heroine-filled capsules, against the subject's will. However, the Supreme Court and Eleventh Circuit have offered little further guidance on what conduct shocks the conscience. *Tinker v. Beasley*, 429 F.3d 1324, 1327 (11th Cir. 2005).[4]

---

[4] Plaintiffs also point to other circuit opinions that hold that mental coercion, instead of physical, can result in a due process violation. *United States ex rel. Corbo v. La Vallee*, 270 F.2d 513, 520 (2d Cir. 1959) ("[t]he Constitution does not safeguard one from physical abuse alone and coercion may take many forms"); *Rogers v. City of Little Rock*, 152 F.3d 790, 797 (8th Cir. 1998). However, holdings from other circuits and district courts cannot be considered when determining if a defendant violated clearly established law. *See Gonzalez v. Lee Cty. Hous. Auth.*, 161 F.3d 1290, 1302 n.38 (11th Cir. 1998) (explaining that "our precedent firmly states that a district court opinion cannot" clearly establish law for qualified immunity); *See, e.g., Loftus*, 690 F.3d at 1206 (a decision from one of our sister circuits "cannot provide 'clearly established' law in this Circuit").

The Eleventh Circuit does differentiate between conscience-shocking conduct and "untoward and upsetting" officer misconduct that "[does] not rise to the level that shocks the conscience." *Tinker*, 429 F.3d at 1329; *Lewis*, 523 U.S. at 855 (concluding that "[r]egardless whether [initiating a high-speed automobile chase in heavy traffic] offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and [defendants] are not called upon to answer for it under § 1983"). This test focuses on the objective reasonableness or unreasonableness of the officers' conduct rather than on the subjective state of mind of the victim. *Tinker*, 429 F.3d at 1328. Here, the fundamental issue is whether the officers' conduct was so unreasonable so as to shock the conscience when Goodwin's will was overborne by the officers' coercion. *See Lewis*, 523 U.S. at 849 (stating that "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level").

The Court also notes that the shock-the-conscience inquiry is different than the unlawful arrest inquiry. An unlawful arrest inquiry looks to whether the officer had arguable probable cause. *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). However, a shock-the-conscience inquiry looks to the objective unreasonableness of the officers' conduct. *Tinker*, 429 F.3d at 1328-29. For this analysis, the Court only determines whether the officers' conduct—urging Goodwin to either remove his dog's head or

have it removed by a veterinarian—violated Goodwin's substantive due process rights.

As an initial matter, Goodwin obviously did not want to cut off his pet's head but, according to him, felt forced by the officers to do so. However, the proper focus is not on whether Goodwin felt coerced, but what actions the officers took to coerce Goodwin into removing his dog's head and whether those actions were "arbitrary." Goodwin contends that "despite initially suggesting that alternatives to decapitating Big Boy were available, Goodwin's attempts to choose these alternative approaches were thwarted by the officers, with Hollis then telling Goodwin that he could either comply with the only remaining option (i.e., personally decapitating his dog) or that "he was going to jail." [Doc. 63-2, p. 9].

However, the video evidence flatly contradicts that version of events. First, Goodwin did as much to narrow his options as the officers. Goodwin insisted on not taking the dog to a veterinarian's office until the following Monday, which Hollis was concerned would be too late to treat the bite victim. [Doc. 53-1, 0:00:25—0:02:30]. Moreover, Hollis had good reason not to allow the dog's body, potentially rabid, to remain unattended. The Court sees no valid reason that a deputy would allow an animal that may have rabies to remain unguarded or secured so that it could either be lost forever or could contaminate more people. As a side note, no one has explained why the deputies could not have called a properly-trained technician to come to the scene to handle the carcass in a safe and protective manner.

Additionally, Hollis's threat of arrest clearly appears to be aimed at restoring decorum and forcing Goodwin into calming down—instead of forcing him to remove his dog's head. [*Id.*]. Hollis never explicitly threatened to arrest Goodwin for refusing to remove the dog's head. [*Id.*] One video of the incident clearly shows Hollis asking this question: "we asking you to remove the dog's head and you refusing right?" [*Id.*]. Hollis then left the scene to consult with other officials not present. [*Id.*]. Hollis's departure after that tense interaction may have made Goodwin even more nervous, but it is not entirely unreasonable that Hollis would want to consult with outside officials about whether Goodwin could be charged for not removing his pet's head or exactly what to do next. Accordingly, the facts do not support Goodwin's straight-forward proclamation that the officers explicitly threatened to arrest him if he did not personally remove his dog's head right then and there.

To be sure, a citizen could potentially recover if a law enforcement officer *directly* used force or *explicitly* threatened to immediately arrest him if he did not personally remove his pet's head. But the record shows that is not what happened here.

Based on the Court's objective and dispassionate review of the record, especially the video recording made during the altercation, as opposed to Goodwin's position in his briefs, the Court does not find that Neesmith and Hollis's actions were so unreasonable and untoward as to shock the conscience, which is admittedly a very high bar. Hollis, presented with a time-sensitive directive to deliver the animal's head to the

Health Department for testing, forcefully urged a distressed Goodwin to calm down and comply with the orders he (Hollis) had been given by the Health Department. And again, the Court agrees that Goodwin was right to be mad and upset when faced with the indignity of removing his pet's head – clearly a disgusting, humiliating and revolting choice that no one should have to endure. But again, that isn't the test. The test focuses on the mindset of the officers, not the citizen. The Court finds nothing in the record to suggest Hollis acted with a sadistic motive toward Goodwin or that he acted to intentionally hurt him when he gave Goodwin the option to remove his dog's head or take it to the vet to be removed. Hollis was attempting to follow the directives of the Health Department protocol, who he was right to consider the subject-matter experts, when he told Goodwin that his dog's head must be removed to be tested for rabies. [Doc. 57, Hollis Depo., pp. 22:7—12, 25:6—26:16]; [Doc. 56, Neesmith Depo., pp. 18:18—19:1, 21:10—14].

While Hollis and Neesmith may not have acted as officers should in de-escalating the tense situation (we will get to that later), this Court finds their actions do not rise to the stringent standard required to legally "shock the conscience" because, simply put, they did not act "arbitrarily" and with a sadistic purpose towards Goodwin when they conveyed his options to him. Rather, they were attempting to comply with the rabies protocol that requires an animal suspected of having rabies to have its head removed for proper testing.

18

Further, even assuming that Goodwin had any substantive due process rights under these very unique circumstances that were violated, he fails to point to any case law that demonstrates that right was clearly established at the time of violation in this circuit or state. Additionally, the Court cannot say that the officers' conduct so obviously violated the Constitution so that prior case law is unnecessary in light of their instructions from the Health Department that the pet's head needed to be removed for testing to protect the victim of the dog bite, and the officers' duty of protection of life and preservation of public order. O.C.G.A § 35-8-2(8)(A).

Thus, the Court finds that Goodwin has failed to carry his burden to show that he had any such substantive due process right or that it was clearly established in December 2017. Hence, Hollis and Neesmith are protected by the doctrine of qualified immunity and the Court **GRANTS** summary judgment to them as to Goodwin's Fourteenth Amendment Substantive Due Process claim.

### iii.      Excessive Force Claims Against Neesmith and Hollis

Hollis and Neesmith next argue that Goodwin's excessive force claim under the Fourth Amendment should be dismissed, and again assert a qualified immunity defense, arguing that Hollis only used de minimis force against Goodwin when he restrained him against his truck. [Doc. 50-1, p. 6].

Goodwin alleges that, after Goodwin requested the officers leave his property, "Hollis became enraged, grabbing Goodwin and spinning him around before slamming

Goodwin onto the hood of his own truck (acts that left welts on Goodwin's back)."
[Doc. 63-2, p. 12]. Video evidence from Neesmith's dashcam shows: (1) Hollis walking
up to Goodwin, (2) Goodwin turning to walk away, (3) Hollis grabbing Goodwin by the
arm as he walks away and shoving him with both hands against a truck as Neesmith
watches. [Doc. 48-9, 1:06:30-1:07:30]. Goodwin claims that, as a result of this injury, he
had a scratch and welts on his back. [Doc. 59-1, Goodwin Depo., pp. 102:15—103:3].
This was the only time Goodwin alleges the officers used force against him. [Doc. 63-2,
pp. 11—13].

The use of excessive force in making an arrest violates the Fourth Amendment.
*Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998). The Eleventh Circuit has
held, "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the
question is whether the officer's actions are 'objectively reasonable' in light of the facts
and circumstances confronting him, without regard to his underlying intent or
motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir.
2004).

The Supreme Court "has long recognized that the right to make an arrest ...
necessarily carries with it the right to use some degree of physical coercion or threat
thereof to effect it." Moreover, the Eleventh Circuit has consistently held that the
"application of de minimis force in making arrest, without more, will not support a
claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d

1253, 1257 (11th Cir. 2000) "A minimal amount of force and injury . . . will not defeat an

officer's qualified immunity in an excessive force case." *Id.* at 1258. Further, even when

de minimis force is unnecessary, it is not unlawful. *Durruthy v. Pastor*, 351 F.3d 1080,

1094 (11th Cir. 2003).

The facts in this case are similar to those in *Nolin.* In *Nolin*, the Eleventh Circuit

found force to be de minimis where the plaintiff suffered bruises on forehead, chest,

and wrists when the officer "grabbed [the plaintiff] from behind by the shoulder and

wrist, threw him against a van three or four feet away, kneed him in the back and

pushed his head into the side of the van, searched his groin area in an uncomfortable

manner, and handcuffed him." *Nolin*, 207 F.3d at 1255, 1258; *see also Jones v. City of

Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (finding the force used to be minor where

officers slammed the plaintiff against a wall, kicked his legs apart, required him to put

his arms above his head, and pulled his wallet from his pants pocket).

Here, Goodwin was grabbed by the arm, spun around, and slammed against his

truck. [Doc. 48-9, 1:06:30-1:07:30]. Based on *Nolin,* the Court considers this level of force

to be de minimis.

Consequently, even if this court found that the level of force used by Hollis was

unreasonable, Goodwin cannot maintain an excessive force claim without some

evidence that the force used was more than de minimis. *Nolin*, 207 F.3d at 1258 ("[A]

minimal amount of force and injury, as present in the facts of this case, will not defeat

an officer's qualified immunity in an excessive force case.") Goodwin has failed to identify any such evidence; therefore, the defendants are entitled to judgment as a matter of law with regard to the Goodwin's § 1983 excessive force claims. Consequently, the Court **GRANTS** summary judgment to Hollis and Neesmith as to Goodwin's claim of excessive force.

### iv.     Unlawful Arrest Claim Against Hollis

Goodwin also contends that the force used against him was excessive because the officers had no right to detain him in the first place. [Doc. 63-2, p. 10] ("Here, the evidence demonstrates that Hollis's violent actions were not made in response to criminal behavior; rather, they were made in response to Goodwin's simple demand that the officers leave his property"). To the extent Goodwin bases his excessive-force claim solely on the detaining officer allegedly lacking any authority to detain, Goodwin is also asserting an unlawful arrest claim.

As a preliminary matter, the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process. *Smart v. City of Miami*, 740 F. App'x 952, 958 n.4 (11th Cir. 2018) (citing *Manuel v. City of Joliet*, —— U.S. ——, 137 S.Ct. 911, 918-19 (2017); *see also Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018) ("[A] warrantless arrest lacking probable cause violates the Constitution, and such an arrest can therefore potentially underpin a § 1983 claim. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010)").

"An arrest is accomplished whenever the liberty of another to come and go as he pleases is restrained, no matter how slight such restraint may be. The defendant may voluntarily submit to being considered under arrest without any actual touching or show of force." *Hough v. State*, 279 Ga. 711, 716, 620 S.E.2d 380, 385 (2005) (citing *Clements v. State*, 226 Ga. 66, 67(2), 172 S.E.2d 600, 601 (1970)). Accordingly, when Hollis restrained Goodwin by pressing him against the truck, Hollis effectuated an arrest and it goes without saying that any arrest of a citizen by his government must be lawful.[5]

Detaining someone on the basis of a false arrest creates a cognizable claim under § 1983. *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996). "An arrest made with probable cause, however, constitutes an absolute bar to a section 1983 action for false arrest." *Marx. v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990). Therefore, if the officers had probable cause to arrest Goodwin, his § 1983 claim alleging false arrest would be barred.

"Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient

---

[5] The Court may have considered the detention to have begun sooner if the Plaintiffs had attached the required notary seal or stamp to make the affidavits admissible. As noted in footnote 1, Goodwin alleges in his affidavit that Hollis told Goodwin that he could not go inside to look for the vaccination records. [Doc. 69-2, ¶ 4]. However, Plaintiffs do not cite to that allegation elsewhere in their statement of facts. [Doc. 63, ¶ 54]. Accordingly, the Court cannot consider this evidence. While Goodwin states in his deposition, that he asked the officers, "if I could leave, no; if I take him up there, no; you know, until the investigation is over you are not going anywhere." [Doc. 59, Goodwin Depo., p. 106:20—25]. However, this partial conversation appears to have taken place after Goodwin was already under arrest. [*Id.*, p. 106:2—20].

to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Gates v. Khokar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (quoting *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010)). It requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 884 F.3d at 1298 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). Thus, "innocent behavior frequently will provide the basis for a showing of probable cause." *Gates*, F.3d at 1298 (quoting *Illinois*, 462 U.S. at 243). Indeed, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Gates*, F.3d at 1298 (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979)).

However, even if an officer arrested a citizen without actual probable cause, that police officer is nonetheless entitled to qualified immunity if he had only "arguable" probable cause to arrest that citizen. *Gates*, F.3d at 1298; *Lee*, 284 F.3d at 1195; *See also Redd v. City of Enterprise*, 140 F.3d 1378, 1383—84 (11th Cir. 1998) ("Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest"); *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) ("[T]he inquiry is ... whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.")

Whether an officer has probable cause or arguable probable cause, or neither,

"depends on the elements of the alleged crime and the operative fact pattern." *Brown*, 608 F.3d at 735; *Skop v. City of Atlanta, Ga*, 485 F.3d 1130, 1139 (11th Cir. 2007) ("This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists").

However, qualified immunity does not insulate an officer from liability where "it is clear that the conduct does not rise to the level of a crime, under the facts known at the time." *Wilkerson v. Seymour*, 736 F.3d 974. 978 (11th Cir. 2013) ("To hold otherwise would eviscerate the concept of probable cause and would permit officers to arrest disagreeable individuals who may be exercising their constitutionally protected rights to free speech, albeit in a loud manner.")

Defendants <u>only</u> argue that Hollis and Neesmith had arguable probable cause to effect an arrest of Goodwin for disorderly conduct. [Doc. 66, pp. 7—8]; [Doc. 67, pp. 7—8]. Viewing the facts in the light most favorable to Goodwin, the Court believes Hollis did not have arguable probable cause to arrest Goodwin for disorderly conduct when Goodwin became visibly upset upon learning Big Boy's head needed to be removed and ordered the officers to get off his property.

Georgia's disorderly-conduct statute applies to anyone who:

(1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health;

(2) Acts in a violent or tumultuous manner toward another person whereby the property of such person is placed in danger of being damaged or destroyed;

(3) Without provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called "fighting words"; or

(4) Without provocation, uses obscene and vulgar or profane language in the presence of or by telephone to a person under the age of 14 years which threatens an immediate breach of the peace.

O.C.G.A. § 16-11-39(a)(1)-(4).[6]

Defendants argue that Goodwin's disorderly conduct included: (1) Goodwin becoming irate and yelling loudly and cursing at the officers, (2) Goodwin's conduct attracted others, including individuals passing by the location of the encounter, and (3) Goodwin ordered the officers to leave his property. [Doc. 66, p. 7]; [Doc. 67, p. 8]. As an initial matter, these factual assertions are partially disputed by Goodwin.

First, Goodwin cites to Hollis's own deposition in arguing that his conduct was not what attracted others and created a scene. [Doc. 63, pp. 9—10]; [Doc. 57, Hollis Depo., p. 42:20—22] ("people rode by in the car, you know, when people see police, they rode by"). Additionally, while Neesmith's dashcam footage shows Goodwin visibly upset, Goodwin also seems to be trying to calm himself down. Goodwin can be

---

[6] In Defendants' reply briefs, they identify the disorderly conduct statute as O.C.G.A. § 16-9-3. [Doc. 66, p. 8]; [Doc. 67, p. 8]. However, the disorderly conduct statute (since 1995) is found at O.C.G.A. § 16-11-39.

seen pacing in his yard and lighting a cigarette while Hollis spoke to someone on the phone. [Doc. 48-9, 1:05:20—1:06:10]. Goodwin can also be seen shaking his head and—while saying something to the officers—gesturing to the officers to get off his property. [*Id.*]. While Goodwin may be angry (and he had good reason to be), the officers did not cite to any evidence that showed they had a reasonable belief that he could become violent. [Doc. 66, pp. 7—8]; [Doc. 67, pp. 7—8].

After restraining Goodwin and being accused of assault, Hollis tells Goodwin that "you were being irate" and appears to cite Goodwin's use of profanity as the main reason. [Doc. 53-1, 0:00:00—0:01:30]. Hollis specifically tells Goodwin, before restraining him, that Goodwin is not "going to talk to me or my deputy like that." [*Id.*]. After Goodwin continues to state that it's not against the law to use profanity, Hollis says, "you're not going to address—I'll tell you what. I will take you jail and charge you." [*Id.*, 0:01:20—0:02:00]. After Goodwin asks for what he'll be charged with, Hollis declines to disclose that information and simply says that Goodwin will find out after he (Hollis) takes him to jail. [7] [*Id.*]. However, Neesmith asserts Goodwin could be charged with disorderly conduct. [*Id.*]. But again, naked recitation of the name of a statute isn't enough; officers have to have some facts that apply to the guts of the statute. In the light most favorable to the plaintiff, these facts suggest that Hollis didn't

---

[7] Needless to say, this Court takes a very dim view of any law enforcement officer that would arrest a citizen, take that citizen to jail, and then figure out why he took him to jail. In America, cops don't get to use the "ready, fire, aim" approach when it comes to an arrest.

appreciate being cursed at and essentially detained Goodwin for using profanity while ordering him and Neesmith to get off his property.

"States cannot apply criminal penalties to protected speech, and Georgia has accordingly tailored its disorderly conduct statute to punish only unprotected fighting words." *Merenda v. Tabor*, 506 F. App'x 862, 865 (11th Cir. 2013).

Presumably, Defendants are alleging arguable probable cause for acting in a "tumultuous or violent manner," which placed them in a reasonable fear of harm. O.C.G.A. § 16-11-39(a)(1). Notably, Defendants do not allege Goodwin used any fighting words, threatened to harm property, or that there were children present. [Doc. 66, pp. 7—8]; [Doc. 67, pp. 7—8]; O.C.G.A. § 16-11-39(a)(2)-(4).[8]

The Georgia Supreme Court has held that the disorderly conduct statute "on its face contains no prohibition against any particular message being communicated, and it makes clear that the level of 'tumultuous' behavior necessary to give rise to a sustainable charge must involve acts that would place another person in reasonable fear for his or her safety." *Freeman v. State*, 302 Ga. 181, 183, 805 S.E.2d 845 (2017). Therefore, the Georgia Supreme Court is clear that only using profanity does not create a cognizable disorderly conduct violation.

Again, Defendants point to no evidence that shows Goodwin's actions would or

---

[8] Children were present when Neesmith shot Big Boy. [Doc. 59-7, Dakon Depo., pp. 14:17—15:3, 45:5—23]; [Doc. 48-9, 0:31:24—0:31:59]. However, Dakon had taken the children to a neighbor's house before the allegedly disorderly conduct that led to the arrest started. [*Id.*, 1:00:40—1:01:32].

did place them in reasonable fear for their safety. [Doc. 66, pp. 7—8]; [Doc. 67, pp. 7—8]. While Goodwin was visibly upset, Neesmith's dashcam video shows Goodwin trying to calm himself down. [Doc. 48-9, 1:05:20—1:06:20]. Further, Goodwin never violently or abruptly approached the officers and always stood several feet away from the officers as he directed them to leave his property. [*Id.*]. Therefore, under Goodwin's version of the facts, as well as the video evidence, which the Court must accept at this stage, the Court finds that Hollis arrested him with neither actual nor arguable probable cause for any crime, much less disorderly conduct.

The Court now must determine whether the constitutional right was clearly established; if so, an officer would not be entitled to qualified immunity. Given the Georgia Supreme Court's precedent cited above, the Court finds that no reasonable officer would have concluded that he could have arrested Goodwin for uttering profanity at him under Georgia's disorderly conduct statute given these circumstances.

Since the law is sufficiently clear, the Court holds that the Plaintiff has carried his burden on the question of qualified immunity as to his illegal arrest claim so that Hollis is not immune from suit. A genuine dispute of material fact exists as to the facts surrounding Goodwin's arrest, including the statements that he made and the way he conducted himself. A jury could reasonably conclude that Hollis arrested Goodwin —in response to learning he would have to remove his pet's head—for using profane language and requesting the officers leave his property.

### v. Unlawful Arrest Claim Against Neesmith

As noted above, the Court has determined that Goodwin's unlawful arrest claim against Hollis survives summary judgment. The Court now turns to Deputy Neesmith.

The Eleventh Circuit has held that "where an officer was present during an arrest and knew that the arresting officer had no reasonable basis for arguable probable cause, the non-arresting officer could be liable under § 1983 if he was sufficiently involved." *Wilkerson*, 736 F.3d at 974 (citing *Jones v. Cannon*, 174 F.3d 1271, 1283-84 (11th Cir. 1999)). "What is made explicit in *Jones* is that a participant in an arrest, even if not the arresting officer, may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way." *Wilkerson*, 736 F.3d at 780.

Here, Goodwin has offered enough evidence from which a jury could conclude that Neesmith was sufficiently involved in Goodwin's arrest to be subjected to § 1983 liability. The record shows Neesmith was the first officer at the scene and observed the conduct leading to the arrest. [Doc. 48-9, 0:00:00—1:06:59]. Additionally, Neesmith participated in the arrest by restraining Goodwin while he was pressed against the truck. [Doc. 48-9, 1:06:59—1:07:06]. Further, Neesmith told Goodwin that he could be charged with disorderly conduct. [Doc. 53-1, 0:01:50—0:01:55]. Therefore, Neesmith was both present during all the events leading to the arrest and an active participant in the arrest.

Additionally, Neesmith appears to be guarding Goodwin while Hollis consults

with officials on his phone. [Doc. 48-9, 1:07:06—1:16:38]. Neesmith stays with Goodwin and—when Goodwin begins removing his pet's head—appears to move with him to supervise the act. [*Id.*]; [Doc. 56, Neesmith Depo., pp. 23:21—24:2 (Goodwin asks Neesmith for permission to "go in and get a sharper knife and we told him sure")].

Therefore, Neesmith sufficiently participated in the arrest and—for the reasons outlined above—is not entitled to summary judgment regarding Goodwin's § 1983 claim for unlawful arrest.

### 4. State Law Claims Against Neesmith and Hollis

Plaintiffs also assert the following state law claims: intentional infliction of emotional distress, assault and battery, false arrest, false imprisonment, cruelty to animals, negligent hiring and retention, and failure to properly train and supervise. [Doc. 21, ¶¶ 18–32].

As Defendants sued in their individual capacity, Hollis and Neesmith, argue that they are entitled to official immunity regarding the Plaintiffs' state law tort claims.

The Georgia Constitution provides that state officers and employees "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const., art. I, § 2, ¶ IX(d). The Supreme Court of Georgia has explained that "'actual malice' requires a deliberate intention to do wrong and denotes 'express malice or malice in fact.'" *Adams v. Hazelwood,* 271 Ga. 414, 520 S.E.2d 896, 898 (1999). "Actual malice requires more than

harboring bad feelings about another." *Id.* Georgia's official immunity is applicable to intentional infliction of emotional distress claim as well as the other state law claims. *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1333 n.4 (11th Cir. 2006).

An act is discretionary in nature if it "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Cushmeer-Muhammad v. Fulton County, Georgia*, NO: 1:08-CV-003256, 2010 WL 11500831, at 12* (N.D. Ga. 2010) (quoting *Hemak v. Houston County Sch. Dist.*, 469 S.E.2d 679, 681 (Ga. Ct. App. 1996)).

However, for Plaintiffs' emotional distress claim, Plaintiffs assert that the officers had a ministerial duty to follow the Health Department protocols for testing Big Boy for rabies and failed to do so.[9] [Doc. 63-2, p. 18]. Plaintiffs argue that, pursuant to the existing policies, the procedure was only to be performed by someone with "training on animal head removal." [*Id.*, p. 17]. The officers never appear to inquire if Goodwin had

---

[9] Both parties cite to the Georgia Rabies Control Manual without identifying where the manual is in the record. [Doc. 63-1, p. 18]; [Doc. 66, pp. 9—10]. Facts that are "not subject to reasonable dispute" may be judicially noticed. Fed.R.Evid. 201(b). Such facts include those that "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* Accordingly, the Court may take judicial notice of the health department manual that is readily available to the public. *Davila v. Gladden*, 777 F. 3d 1198, 1207 n.3 (11th Cir. 2015); *See, e.g., United States v. Thornton*, 511 F.3d 1221, 1229 n.5 (9th Cir. 2008) (taking judicial notice of a BOP Program Statement regarding organ transplants for prisoners); *Antonelli v. Ralston*, 609 F.2d 340, 341 n.1 (8th Cir. 1979) (taking judicial notice of a Program Statement issued by the BOP relating to prisoners' mail). Thus, the Court takes judicial notice of the Rabies Control Manual cited by both parties. *See* Georgia Rabies Control Manual (April 2018) at: https://dph.georgia.gov/sites/dph.georgia.gov/files/related_files/site_page/Rabies%20Manual_April%202018_final.pdf

the requisite training. Accordingly, Plaintiffs assert the officers were not performing a discretionary act; thus, Goodwin argues that the officers did not need to act with actual malice. [*Id.*, p. 16].

In response, Defendants assert that the "guidelines are recommended"; thus, the policy did not mandate definite action and the officers were performing a discretionary act. [Doc. 66, pp. 9—10].

A "ministerial act" is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. *Clark v. Prison Health Servs.*, 572 S.E.2d 342, 346-47 (Ga. Ct. App. 2002). A policy creates a ministerial duty for the official when the policy mandates a "simple, absolute, and definite action and requires the execution of a specific task without any exercise of discretion." *Grammens v. Dollar*, 287 Ga. 618, 619-20, 697 S.E.2d 775, 777-78 (2010). The policy clearly labels the guidelines for removal as "recommended" and to be used "whenever possible." [Doc. 66, p. 9]. Thus, the policy merely specifies a recommended procedure—in contrast to a mandatory one directing definite action— and the officers had some degree of discretion when deciding how best to remove the dog's head. Accordingly, the officers were performing discretionary acts.

Thus, to pierce the officers' official immunity for all state law claims, Goodwin must demonstrate they acted with actual malice. *Bashir*, 445 F.3d at 1333; *Adams v. Hazelwood*, 271 Ga. 414, 414-15, 520 S.E.2d 896, 898 (1999). The Supreme Court of

Georgia has explained that "actual malice' requires a deliberate intention to do wrong and denotes 'express malice or malice in fact.'" *Id*. (quoting *Merrow v. Hawkins*, 266 Ga. 390, 467 S.E.2d 336, 338 (1996)) (citation omitted).

Actual malice is not necessarily inferred simply because of a valid § 1983 unlawful arrest claim. *Bashir*, 445 F.3d at 1333 ("Although . . . the record supports the conclusion the deputies acted unreasonably and violated Bashir's Fourth Amendment rights, Bashir has not sustained his burden of demonstrating the existence of a genuine issue of fact that the deputies possessed "a deliberate intention to do wrong" sufficient to satisfy the actual malice standard.").

Plaintiffs have not demonstrated that the Defendants acted with actual malice. Accordingly, the Defendants are entitled to official immunity regarding the Plaintiffs' state law claims. The officers' actions appear to be aimed at restoring decorum to a tense situation and not to sadistically force Goodwin to sever the dog's head. However, even if the officer's actions were meant to force Goodwin to remove his dog's head, the Court has uncovered no facts in the record that shows a deliberate action to do wrong. Instead, the officers seem to be focused on sending the dog's head to the Health Department to ensure the bitten victim received the proper care if the dog had rabies. [Doc. 59-1, Goodwin Dep. p. 71: 3—17] (Claiming Hollis stated, "[i]f your dog is rabid and bit that lady, we have got to have her tested and we need that head now").

Therefore, Defendants are entitled to official immunity and Plaintiffs' state law

claims are **DISMISSED**.

<u>CONCLUSION</u>

Based on the foregoing, all Defendants are entitled to summary judgment on any claim made by Plaintiff Dakon. The Court **GRANTS** Defendants Walker and Crawford County's Motions For Summary Judgment as to all claims lodged against them. [Doc. 48]; [Doc. 49]. Further, the Court **GRANTS** in part and **DENIES** in part Defendants Hollis and Neesmiths' Motions for Summary Judgment. [Doc. 50]; [Doc. 51]. Defendants Hollis and Neesmith are granted summary judgment as to Goodwin's state law claims and Goodwin's § 1983 claims based on the Fifth, Eighth, and Fourteenth Amendments. However, Plaintiff Goodwin's claims against Defendants Hollis and Neesmith for Fourth Amendment violations pursuant to an unlawful arrest may proceed.

**SO ORDERED**, this 21st day of February, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**